# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID A. ABRAMS, No. 241224, a/k/a ABRAHAMS,<br><br>          Plaintiff,<br><br>  v.<br><br>CORRECTIONS OFFICER WATERS AND CAPT. NUNEZ, sued in their individual capacities; CORRECTIONS OFFICER PHILLIPS; DISCIPLINARY REPORT INVESTIGATOR KELLY; CAPT. JOHN WATSON; WARDEN SCOTT ERFE; MAINTENANCE SUPERVISOR JOHN DOE; and MAILROOM HANDLER CORRECTIONS OFFICER RAMIREZ, sued in their individual and official capacity,<br><br>          Defendants. | Civil Action No.<br>3: 17 - CV - 1659 (CSH)<br><br><br><br><br>FEBRUARY 2, 2018 |

## INITIAL REVIEW ORDER

**Haight, Senior District Judge:**

*Pro se* plaintiff David A. Abrams, currently incarcerated at the Corrigan-Radgowski Correctional Institution ("Corrigan") in Uncasville, Connecticut, has brought this civil rights action against various prison officials and employees of Cheshire Correctional Institution ("Cheshire C.I."), the prison where he was formerly housed, in Cheshire, Connecticut. The defendants include Corrections Officer Waters, Captain Nunez, Corrections Officer Phillips, Investigator Kelly, Captain Watson, Warden Erfe, Supervisor John Doe, and Corrections Officer Ramirez (herein collectively "Defendants"). Abrams is suing Waters and Nunez in their individual capacities and all other

defendants in their individual and official capacities. He is seeking monetary damages and declaratory relief.

With respect to procedural history, Magistrate Judge Garfinkel granted Abrams's motion to proceed *in forma pauperis* on October 13, 2017. *See* Doc. 5. The Court now reviews Abrams's Complaint to determine whether his claims are "frivolous" or may proceed under 28 U.S.C. § 1915A. For the following reasons, the Court dismisses his complaint in part.

## I. <u>STANDARD OF REVIEW</u>

Under 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." *See* 28 U.S.C. § 1915A(b)(1)-(2). Although highly detailed allegations are not required, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)).[1] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "A pleading that offers 'labels and conclusions'

---

[1] The Second Circuit has consistently adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal*. *See, e.g.*, *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017); *Christine Asia Co. v. Ma*, No. 16-2519-CV, 2017 WL 6003340, at *1 (2d Cir. Dec. 5, 2017); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 401 (2d Cir.2015); *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp.*, *PLC*, 709 F.3d 109, 119-20 (2d Cir. 2013).

or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).

"[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is `inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). *See also Amaker v. New York State Dept. of Corr. Servs*., 435 F. App'x 52, 54 (2d Cir. 2011) (same). Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

With respect to *pro se* litigants, it is well-established that "[p]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)(per curiam)). *See also Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (same)*; Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants); *Boykin*

*v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008) ("A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (Where the plaintiff proceeds *pro se*, a court is "obliged to construe his pleadings liberally.") (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("In reviewing a *pro se* complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[].").

Despite being subject to liberal interpretation, a *pro se* plaintiff's complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal,* 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Nor may the Court "invent factual allegations" that the plaintiff has not pleaded. *Id.*

## II. <u>FACTUAL ALLEGATIONS</u>

In April and May of 2017, while incarcerated at Cheshire C.I., Abrams wrote to his Unit Manager, Captain Nunez, requesting that he be moved out of the cell he shared with "high security" inmate William Carrilli, who was "well known for his racist views." Doc. 1 ("Complaint"), ¶ 57. Nunez did not act on Abrams's request. *Id.* On July 6, 2017, after Carrilli complained to Nunez that he and Abrams were not getting along, Nunez promptly moved Abrams to an empty cell. *Id.*, ¶ 58. During the move, Abrams explained to Nunez that he only had one disciplinary ticket in his file in

16 years and asked Nunez not to place another "high security" inmate in his new cell. *Id.* Later that day, Kashawn Brown, another "high security" inmate, was placed in Abrams's cell. *Id.*, ¶ 60. Abrams protested to the cell-block correction officer, but the officer told him that there was "nothing he could do about it and that [Abrams] would have to talk to Nunez about the situation." *Id.*

Brown had just been transferred from Corrigan to Cheshire C.I. after spending nearly a month in segregation for assaulting his cellmate. *Id.*, ¶¶ 61-62. He had been involved in two previous fights with his cellmates over the previous year. *Id.*, ¶ 63.

On August 4, 2017, at approximately 12:15 p.m., Brown attacked Abrams while Abrams was sitting on his bed watching television. *Id.*, ¶ 16. Brown punched Abrams multiple times on the side of his face. *Id.*, ¶ 17. Abrams became "slightly dazed" and tried to "shake . . . off" the attack. *Id.* After punching Abrams several times, Brown banged on the cell door and screamed for an officer. *Id.*, ¶ 18. The officer's station was located approximately twenty feet from Abrams's cell. *Id.*, ¶ 19.

Correction Officer Waters came to Abrams's cell to identify the problem. *Id.*, ¶ 20. Brown told Waters to "call the code blue ([the] code for inmates fighting) because he [was] done." *Id.* When Waters asked Brown what he meant, Brown charged at Abrams again and hit him several times in front of Waters. *Id.* Waters yelled, "Code Blue! Code Blue! Stop fighting! Stop fighting!" *Id.*, ¶ 21. After enduring multiple punches, Abrams stood up to defend himself, which prompted Brown to retreat to the cell door. *Id.,* at ¶ 22. Immediately thereafter, the cell door opened, and officers handcuffed Brown on the floor of the unit. *Id.*, at ¶ 23. They did not use mace spray on Brown. *Id.*

As Corrections Officers Johnson and Phillips entered the cell, Abrams stumbled forward and collided with a chair. *Id.*, ¶ 24. At that moment, Correction Officer Phillips sprayed him with mace.

*Id.* When Abrams bent forward to cover his eyes and gasp for air, Phillips picked him up and "slamm[ed] him to the floor causing his face to hit the floor." *Id*., ¶ 25. Phillips then proceeded to handcuff Abrams and told him to "stop resisting," even though Abrams was lying on the floor coughing. *Id.*, ¶ 26. Johnson then helped Abrams to his feet. *Id.*, ¶ 27. The officers transported Abrams to the medical unit to treat his injuries and then placed him in a segregation unit. *Id.*, ¶ 28.

As a result of the attack, Abrams was breathing heavily, had "an extremely elevated blood pressure," had "knots on the side of his face and on his forehead," and "severe swelling" around his eyes. *Id.,* ¶ 29. Captain Dimitrix and Lieutenant Marquis witnessed the incident and questioned Abrams about it. *Id.*, ¶ 30. The entire incident was recorded on camera, and the footage was preserved via request to Correction Officer McMahon on August 6,2017. *Id.*

Due to the swelling near Plaintiff's both eyes, the nurse in the medical unit suggested that Plaintiff's eye socket might be fractured. *Id.*, ¶ 31. Abrams was therefore taken to the UCONN Health Center to be examined. *Id.*

When he arrived at the UCONN Health Center, a nurse named Lisa informed Abrams that he might indeed have a fractured eye socket due to the swelling without bruising. *Id.*, ¶ 32. Nurse Lisa arranged for Abrams to undergo a CAT scan. *Id.,* ¶ 33. One hour later, she informed Abrams that he did not have a fractured eye socket but that he had suffered a hairline fracture to his nose, causing the swelling around his eyes.. *Id.*, ¶ 34. Abrams told the nurse that Brown never punched him in his nose. *Id.,* ¶ 35. The nurse responded that he most likely sustained the fracture when Officer Phillips slammed him to the floor. *Id*., ¶¶ 35-37. She recommended that Abrams apply ice to his face for a few days, placed him on a soft diet, and advised him to sleep with his head elevated. *Id.,* ¶ 39. She also advised Plaintiff that he might have a concussion. *Id.*

When he arrived back at Cheshire from the UCONN Health Center, Abrams was escorted to segregation. *Id.,* ¶ 40. Before placing him in the segregation unit, officers strip searched Abrams in accordance with Cheshire C.I. policy. *Id.* When asked about the strip search by another inmate in segregation, Correction Officer Watson stated that it was "facility policy." *Id.*, ¶ 82.

On August 7, 2017, three days after the incident, Investigator Kelly called Abrams to his office to hear his version of the facts and ascertain whether Abrams was going to plead guilty to the disciplinary report for fighting. *Id.*, ¶ 41. Abrams told Kelly that the fact that a disciplinary report had been issued against him was "crazy" and "bogus." *Id.*, ¶ 42. He also asked Kelly why Officer Waters, who had been the person to witness the attack and who had called the "code blue," was not the officer who wrote up the report.. *Id.* Abrams also told Kelly that he "didn't fight back" and that Waters and the camera footage would corroborate his version. *Id.*, ¶ 43. Kelly responded by telling Abrams, "It doesn't work like that around here . . . ." *Id.*, ¶ 44. Abrams then replied, "Cut the bullshit! I've been around for a long time. . . . The ticket is bogus." *Id.*

After spending a week in the segregation unit, Abrams notice what appeared to be black mold on the vent in his cell and informed Captain Watson about it. *Id.*, ¶ 45. Abrams had observed such mold on the segregation cell vents when he had been housed there five months earlier. *Id.* Watson said to Abrams, "Stay out of seg[regation] and you won't have to worry about it." *Id.*, ¶ 46.

On August 16, 2017, while in segregation, Abrams mailed correspondence to a referral service in an attempt to obtain legal counsel for his civil and criminal cases. *Id.*, ¶ 85. The correspondence contained a brief description of each case, including two civil cases against Cheshire correctional staff. *Id.*, ¶ 86. The words "legal mail" were printed in two different places on the envelope. *Id.,* ¶ 87. One week later, Abrams learned that his correspondence was returned to

Cheshire because the "post office was unable to forward [it]'" after Plaintiff had been transferred to Corrigan on August 23, 2017. *Id.*, ¶ 89. A month later, on September 13, 2017, Abrams received the correspondence at Corrigan and discovered that the envelope had been opened out of his presence and forwarded to him. *Id.*, ¶ 90.

During his disciplinary hearing on August 22, 2017, Officer King dismissed the charge against Plaintiff for fighting with Brown. *Id.*, ¶ 47. He based his decision on the facts that Brown had pled guilty to assaulting Abrams and had no injuries; Abrams had sustained injuries; and in the absence of video footage, no one could refute Abrams's version of the case. *Id.* On August 23, after spending twenty days in segregation, Abrams was transferred from Cheshire C.I. to Corrigan. *Id.*, ¶ 48.

## III. DISCUSSION

The Court will assess each of Abrams's claims to determine whether any claim "is frivolous, malicious, or fails to state a claim upon which relief may be granted," or a claim that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1)- (2).

### A. Claims Against Defendants in their Official Capacities

Abrams seeks monetary relief against all defendants in their individual and official capacities, with the exception of Waters and Nunez, whom he is suing only in their individual capacities. To the extent that Abrams seeks money damages from the defendants in their official capacities, the claims are barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159 (1985); *Quern v. Jordan*, 440 U.S. 332, 342 (1979). "The Eleventh Amendment precludes suits against states unless the state expressly waives its immunity or Congress abrogates that immunity." *Li v. Lorenzo*, No. 16-3530, 2017 WL 4410586, at *1 (2d Cir. Oct. 4, 2017) (citing *CSX Transp., Inc. v.*

*N.Y. State Office of Real Prop. Servs.*, 306 F.3d 87, 94-95 (2d Cir. 2002)). "This includes suits against state officials in their official capacities." *Li*, 2017 WL 4410586, at *1 (citing *Davis v. New York*, 316 F.3d 93, 101-02 (2d Cir. 2002)). *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) ("The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest.") (citation and internal quotation marks omitted); *Santiago v. New York State Dep't of Corr. Servs.*, 945 F.2d 25, 28 n. 1 (2d Cir.1991) ("When the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.") (citation and internal quotation marks omitted). Accordingly, claims brought against corrections officer defendants in their official capacities are properly dismissed for lack of jurisdiction.

In contrast, as to injunctive relief, the United States Supreme Court stated in *Edelman v. Jordan*, 415 U.S. at 664 (1974 ), that the Eleventh Amendment does not bar an action against a state official for violation of federal law if the plaintiff seeks an injunction regarding that official's future conduct. *See also Feng Li v. Rabner,* 643 F. App'x 57, 57-59 (2d Cir. 2016) ("As to the individual defendants, generally, state officials are not immune under the Eleventh Amendment if the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." ) (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 645 (2002)) (internal quotation marks omitted). However, Plaintiff does not request injunctive relief against any of the state official defendants. Accordingly, all of Plaintiff's claims against the defendants in their official capacities are hereby DISMISSED pursuant to 28 U.S.C. § 1915A(b)(2).

## B.    Claims Against Erfe, Doe, and Ramirez

In his Complaint, Abrams names Warden Erfe, Supervisor Doe, and Officer Ramirez as defendants with respect to his alleged constitutional deprivations.  Plaintiff does not, however, allege that any of these three supervisory defendants was personally involved in the acts giving rise to these claims.  Rather, he appears to sue them based merely on their positions as supervisors at Cheshire C.I.

"It is well settled . . . that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation and internal quotation marks omitted); *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) (doctrine of *respondeat superior* does not suffice for claim of monetary damages under § 1983).  A plaintiff who sues a supervisory official in his individual capacity for monetary damages must allege that the official was "personally involved" in the constitutional deprivation in one of four ways:  (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; or (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event.  *Wright*, 21 F.3d at 501; *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).  "In addition, supervisory liability may be imposed where an official demonstrates gross negligence or deliberate indifference to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright*, 21 F.3d at 501 (citation and internal quotation marks omitted).  Therefore, in order to state plausible claims against these three supervisory officials, Abrams must allege a causal link between

the conduct of the supervisory officials, or lack thereof, and his injury. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

In the case at bar, Abrams fails to allege that Erfe, Doe, and Ramirez were involved in, or even knew about, the constitutional violations for which he seeks to hold them liable. *See Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (to impose supervisory liability prisoner must allege that official had "actual or constructive notice of unconstitutional practices and demonstrate[d] 'gross negligence' or 'deliberate indifference' by failing to act") (quoting *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir.1983)). Abrams simply alleges that Erfe, as the warden at Cheshire C.I., failed to correct what Abrams views as an unconstitutional policy of strip searching inmates upon entry to segregation. *Id.*, ¶ 107. However, he fails to allege that Erfe was responsible for this policy or was negligent in managing his subordinates in implementing it.[2]

Similarly, Abrams alleges that Doe and Erfe, as supervisors, failed "to maintain a hazard free condition of confinement" regarding the mold on Abrams's cell vent in the segregation unit. *Id.*, ¶¶ 94, 110. However, Plaintiff does not allege that either of these defendants was aware of the mold or of any conditions in the segregation unit which may have caused the mold to be present.

In addition, Abrams seeks to hold Ramirez liable for interfering with his legal mail because he "is the facility's mail handler [and] is responsible for incoming [and] outgoing mail." *Id.*, ¶ 91.

---

[2] The Court takes judicial notice that pursuant to State of Connecticut Department of Corrections ("DOC") Administrative Directive 6.7, the prison must conduct a strip-search of an inmate "upon initial placement in a specialized housing unit, to include ... administrative segregation ... [and] restrictive housing." *See* Admin. Directive 6.7(5)(A)(6)(a) and (h). The fact that Plaintiff was strip searched when he was placed in segregation complied with Connecticut's DOC administrative directives.

Plaintiff does not, however, allege that Ramirez knew about the situation regarding his legal correspondence.

In sum, based on the allegations in the Complaint, Abrams has attempted to sue Erfe, Doe, and Ramirez based solely on each of their supervisory roles at Cheshire C.I., which is insufficient to allege personal involvement in any constitutional deprivation. *See Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (dismissing claims for lack of defendants' "personal involvement" where "plaintiff's claim for monetary damages against these [supervisory official] defendants requires a showing of more than the linkage in the prison chain of command; the doctrine of respondeat superior does not apply"); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983;" so the fact that Commissioner was in high position of authority was an insufficient basis for personal liability). Accordingly, Plaintiff's claims against Erfe, Doe, and Ramirez are hereby DISMISSED.

## C.      Eighth Amendment Excessive Force Claim

"[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (quoting *Hudson v. McMillian*, 503 US. 1, 4 (1992)). However, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins,* 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9); *see also Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (not every push or shove violates prisoner's constitutional rights); *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) ("Hence, a *de minimis* use of force will rarely suffice to state a constitutional claim.").

To establish a claim of excessive force under the Eighth Amendment, the prisoner must satisfy a subjective and objective component. *See*, e.g., *Sims*, 230 F.3d at 20-21. "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Id.* at 21 (citation and internal quotation marks omitted). With respect to excessive force, the subjective component requires a showing that official's use of physical force was exerted "maliciously and sadistically rather than as part of 'a good faith effort to maintain or restore discipline.'" *Wilkins*, 559 U.S. at 40 (quoting *Hudson*, 503 U.S. at 9).

The objective component "focuses on the harm done" in light of contemporary standards of decency, but the amount of harm that must be shown depends on the nature of the claim. *Sims*, 230 F.3d at 21; *Banks v. Cty. of Westchester*, 168 F. Supp.3d 682, 688 (S.D.N.Y. 2016). Some degree of injury ordinarily will be required. *Banks*, 168 F. Supp.3d at 688. However, the prisoner does not have to show that he sustained a significant injury in order to prevail on an excessive force claim. *Sims*, 230 F.3d at 22; *Wilkins*, 559 U.S. at 37. A prisoner sufficiently states an Eighth Amendment claim if he "alleges facts from which it could be inferred that prison officials subjected him to excessive force, and did so maliciously and sadistically . . . ." *Sims*, 230 F.3d at 22.

In the instant case, Abrams alleges that Phillips used excessive force on him, in violation of his Eighth Amendment right to be free from cruel and unusual punishment, by picking him up and "slamming" him face -first to the concrete floor of the cell after Abrams was attacked by Brown. Doc. 1, ¶¶ 50-56. Plaintiff's allegations fulfill both the objective and subjective prongs to state a plausible claim of excessive force against Phillips. After spraying his eyes with mace, Phillips allegedly "slammed [Abrams] to the floor causing his face to hit the floor." *Id.*, ¶ 51. At that point,

the altercation between Brown and Plaintiff had ended. Brown was hand-cuffed, lying on the floor; and Plaintiff was bent over, covering his eyes and gasping for air. *Id.*, ¶¶ 49, 51. Under such circumstances, Phillips was not subduing a prisoner who was engaged in a fight or who was resisting him. Therefore, Phillips's alleged behavior involved the unnecessary and wanton infliction of pain, in this case fracturing Plaintiff's nose. Moreover, such behavior defied contemporary standards of decency. Subjectively, where no conflict was in progress at that time, Brown having exited the cell, it can be inferred that Phillips's exercise of such gratuitous force was applied for purposes of hurting Abrams, rather than a "good-faith effort to maintain or restore discipline." *Hudson,* 503 U.S. at 7. Plaintiff's excessive force claim will proceed against Phillips in his individual capacity.

D.    **Eighth Amendment Failure to Protect Claim**

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of . . . inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotations omitted). However, not every injury suffered by one prisoner from another prisoner establishes constitutional liability on the part of the prison official responsible for the victim. *Id.* at 834. A prison official violates the prisoner's Eighth Amendment protection against cruel and unusual punishment only when the following two requirements are satisfied. *Id.*

First, the prisoner must prove that the deprivation was "objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 298). If the claim is based on the official's failure to prevent harm, the plaintiff must prove that he is "incarcerated under conditions posing a substantial risk of serious harm." *Id.* To determine whether the prisoner faced an excessive risk of

serious harm, courts "look at the facts and circumstances of which the official was aware at the time he acted or failed to act." *Hartry v. County of Suffolk*, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (internal quotations and citation omitted).

Secondly, the prisoner must prove that the prison official acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 302-03). This requirement is based on the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Id.* (quoting *Wilson*, 501 U.S. at 297). The prison official must have known of and disregarded an excessive risk to the prisoner's health or safety. *Id.* at 837. Whether an official had knowledge of a substantial risk of harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. Therefore, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* The question under the Eighth Amendment is "whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health." *Id.* at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

In the case at bar, Abrams alleges that on July 6, 2017, after he was attacked by inmate Carrilli, he personally asked Captain Nunez "that he not be paired up with another 'high security' prisoner" as a cellmate. Doc. 1, ¶ 58. Nevertheless, ignoring that request, at 9:15 pm on that night, Nunez placed inmate Brown, who had a history of assaulting his cellmates, in Abrams's cell. *Id.*, ¶¶ 61-63. One month later, Brown assaulted Abrams in their cell, punching him repeatedly and thereby causing him injuries. *Id.* ¶¶ 16-18, 29. Construed liberally, these allegations plausibly state an Eighth Amendment claim against Nunez for failure to protect Abrams from harm.

Brown had been transferred to Cheshire C.I. immediately following a month spent in segregation for assaulting a previous cellmate and knocking him unconscious. Doc. 1, ¶¶ 61-62. Moreover, Brown was labeled a "high security" risk inmate, having "been involved in 2 previous attacks on his cellmates over the past year and involved in another fight." *Id.,* ¶¶ 62-63. Placing Abrams in the same cell with Brown, who has a history of attacking cellmates, may be interpreted as deliberate difference to exposing Abrams to an excessive risk of serious harm. Abrams had asked Nunez on that very day that he not be placed with such an individual. Under these allegations, it may be inferred that Nunez had "knowledge of a substantial risk of harm" to Abrams in placing a "high security" risk inmate like Brown in Abrams's cell. At the screening stage, construing the alleged facts liberally, interpreting them to make the strongest argument that they suggest, Plaintiff's allegations make out a plausible Eighth Amendment failure to protect claim. Plaintiff may thus proceed against defendant Nunez on this claim for monetary damages in his individual capacity.

**E.**    **<u>Eighth Amendment Conditions of Confinement Claim</u>**

To state an Eighth Amendment claim for unconstitutional conditions of confinement, a prisoner must allege facts demonstrating the failure of prison officials to provide for his "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). A prisoner may prevail on an Eighth Amendment claim based on unconstitutional conditions of confinement "only where he proves both an objective element – that the prison officials' transgression was 'sufficiently serious' – and a subjective element – that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with "deliberate indifference to inmate health or safety." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer*, 511 U.S. at 834).

A condition is objectively serious if it "'pose[s] an unreasonable risk of serious damage to [a prisoner's] future health.'" *Phelps*, 308 F.3d at 185 (quoting *Helling*, 509 U.S. at 35). Thus, the "objective component relates to the seriousness of the injury." *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994). To "establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citations and internal quotation marks omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). The Second Circuit has clarified that the alleged "unsanitary conditions of confinement must be assessed according to two components, severity and duration, on a case-by-case basis." *Darnell*, 849 F.3d at 30 (discussing *Willey v. Kirkpatrick*, 801 F.3d 51, 66-68 (2d Cir. 2015)).

To meet the subjective component, the prisoner must allege that the official knew "of and disregard[ed] an excessive risk to inmate health or safety," that is, that he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and … dr[e]w that inference." *Phelps*, 308 F.3d at 185-86. *See also Wilson v. Seiter*, 501 U.S. 294, 303 (1991)(holding it is "appropriate to apply 'deliberate indifference' standard articulated in *Estelle* [*v. Gamble*, 429 U.S. 97 (1976) ]" to cases of "inhumane conditions of confinement, failure to attend to [a prisoner's] medical needs, or a combination of both"). The prisoner may state an Eighth Amendment claim based on allegations that the official, with deliberate indifference, exposed him

to an unsafe condition that posed an unreasonable risk of serious harm to his future health. 509 U.S. at 34-35.

Here, Abrams alleges that Captain Watson exposed him to a hazardous condition of confinement by dismissing his complaint about the black mold on the vent in his segregation cell. Doc. 1, ¶¶ 45-46. According to Abrams, when he informed Watson about the mold, Watson said, "Stay out of seg[regation] and you won't have to worry about it." *Id.*, ¶ 46. Abrams's allegation that he was exposed to black mold in his cell satisfies the objective component of the Eighth Amendment standard. Courts in this District have repeatedly found mold to pose a substantial risk of danger to a prisoner's health. *See, e.g., Barney v. Semple*, No. 3:17-CV-685 (AWT), 2017 WL 2380165, at *2 (D. Conn. May 31, 2017) ("The court concludes that the alleged conditions are sufficient to support a plausible claim for unconstitutional conditions of confinement" where plaintiff alleged, *inter alia*, that he was exposed to "black and yellow mold" in the Q-building, where he was housed.); *Wade v. Chapdelaine*, 17 Civ. 350 (JAM), 2017 WL 1479417, *2 (D. Conn. Apr. 24, 2017) (prisoner's exposure to friable asbestos and mold constitutes objectively substantial risk of serious harm); *Toliver v. Comm'r Semple*, 16 Civ. 1899 (SRU), 2016 WL 7115942, *2 (D. Conn. Dec. 6, 2016) (same).

In addition, Plaintiff has met the subjective prong of his claim, alleging that Watson was aware of the mold on the segregation cell vent but was deliberately indifferent to the risk it posed to Abrams's health. In particular, upon being informed about the mold on Abrams's cell vent, Watson merely replied by telling Abrams to "stay out" of segregation if he wished to avoid it. *Id.*, ¶¶ 45- 46. In sum, Watson disregarded the mold, which posed "an excessive risk" to Plaintiff's

safety. *Phelps*, 308 F.3d at 185-86. Based on these allegations, Abrams has stated a plausible Eighth Amendment "conditions of confinement" claim against Watson. That claim may proceed.

## F.    Fourth and Eighth Amendment Claims for Intrusive Strip Search

Abrams claims that the strip search he was forced to undergo before transfer to the segregation unit violated his Fourth and Eighth Amendment rights. Doc. 1, ¶ 107. In particular, in his Complaint, Plaintiff alleges that he "was subjected to an intrusive strip search in which he was ordered to bend over at the waist and spread his butt cheek per 'protocol' before being placed in his segregation cell." *Id.*, ¶ 80. He fails to allege any facts to prove that the search was done improperly or to explain why he believes that searching a prisoner before placing him in segregation is unconstitutional.

Furthermore, Plaintiff fails to designate who performed or ordered the search and/or whom his claim is against. The only defendant Plaintiff mentions in regard to this claim is Captain Watson, who stated that the search was "facility policy." Doc. 1, ¶ 82. The Court will thus analyze the claim generally, to determine whether it states a plausible claim for a constitutional violation.

### 1.    Fourth Amendment

Although "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell, *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), . . . maintenance of prison security is not burdened unduly by the recognition that [prisoners] do retain a limited right to bodily privacy, *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir.1992)." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (lateral citation omitted). The Fourth Amendment protects prisoners against overly intrusive body cavity searches. *Harris*, 818 F.3d at 57. "Courts assessing an inmate's claim that officers infringed his or her right to bodily privacy must undertake a two-part inquiry: (1) First, the

court must determine whether the inmate has exhibit[ed] an actual, subjective expectation of bodily privacy; and (2) second, the court must determine whether the prison officials had sufficient justification to intrude on [the inmate's] [F]ourth [A]mendment rights." *Id.* (quoting *Covino*, 967 F.2d at 77-78) (internal quotation marks omitted).

Moreover, "[i]f the inmate's claim challenges a prison regulation or policy, courts typically analyze the claim under *Turner v. Safley*, 482 U.S. 78, 107 (1987)." *Harris*, 818 F.3d at 57 (lateral citation omitted). "Under *Turner*, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 57-58 (internal quotation marks omitted). This involves four factors:

> [(1)] whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; [(2)] whether there are alternative means of exercising the right in question that remain open to prison inmates; [(3)] whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards or other inmates, and upon the allocation of prison resources generally; and [(4)] whether there are reasonable alternatives available to the prison authorities.

*Covino v. Patrissi*, 967 F.2d 73, 78-79 (2d Cir. 1992) (citing *Turner*, 482 U.S. at 89-90). It is the prisoner's burden to show that a challenged prison regulation is unreasonable. *Id.* at 79.

Abrams claims that, on August 4, 2017, before placing him in the segregation unit, prison officials subjected him to a strip search. Doc. 1, ¶¶ 40, 80. When Chauncey Moore, a prisoner in a neighboring cell in segregation, questioned Watson about "this type of intrusive strip search," Watson told him that it was "facility policy." *Id.* at ¶ 82. Plaintiff argues that this policy must only exist at Cheshire C.I. because he "has been incarcerated for 17 years at MacDougall C.I., Walker C.I., and Corrigan C.I. and has never experienced this type of strip search." *Id.*, ¶ 81. Standing alone, these allegations do not meet the burden of establishing that the prison strip search policy is unreasonable.

Abrams does not contest Watson's statement that the search was conducted in accordance with Cheshire's policy. Aside from alleging that Plaintiff was not subject to strip searches at other facilities, Abrams makes no attempt to show that the strip search at Cheshire was unreasonable or unrelated to a penological interest.

The Supreme Court has recognized that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328, 344-45 (2012). For example, "courts in this District have uniformly held, in light of the Supreme Court's decision in *Florence*, that '[t]he general practice of strip searching a detainee during housing searches and on the way to and from court appearances is not unconstitutional, even if the detainee is accused only of a misdemeanor.'" *Keaton v. Ponte*, No. 16 CIV. 3063 (KPF), 2017 WL 3382314, at *12 (S.D.N.Y. Aug. 4, 2017) (citing *Thompson v. City of N.Y.*, No. 16 Civ. 824 (PKC), 2017 WL 1929552, at *2 (S.D.N.Y. May 9, 2017) (collecting cases)). *See also Perkins v. City of New York.*, No. 14 Civ. 3779 (WHP), 2017 WL 1025987, at *2 (S.D.N.Y. Mar. 15, 2017) ("Strip searches are permissible provided that the search is tied to legitimate security interests, a determination that is peculiarly within the province and professional expertise of correctional officers. . . . And random strip searches may be conducted even in detainees' housing units.") (citations and internal quotation marks omitted); *Myers v. City of New York*, No. 11 CIV. 8525 (PAE), 2012 WL 3776707, at *9 (S.D.N.Y. Aug. 29, 2012) ("[U]nder the standard outlined in *Florence*, the searches to which [plaintiff] was subjected were "reasonably related to legitimate security interests," including preventing the smuggling of contraband into or out of [the jail in which plaintiff was confined].") (quoting *Florence*, 566 U.S. at 326), *aff'd*, 529 F. App'x 105 (2d Cir. 2013).

In the case at bar, a Connecticut Department of Corrections ("DOC") regulation requires a strip search upon a prisoner's placement in specialized housing. *See* State of Connecticut Administrative Directive 6.7 ("Searches Conducted in Correctional Facilities"), at § 5(A)). That regulation is valid because it is "reasonably related to legitimate penological interests" – ensuring that no weapon or contraband item is being transported when a prisoner is transferred into the specialized housing unit. *See, e.g., Holloway v. Dep't of Corr.*, No. 3:11-CV-1290 (VLB), 2013 WL 4834657, at *5 (D. Conn. Sept. 10, 2013) ("The parties do not contest the fact that subsection 5(A) of Administrative Directive 6.7 which requires that an inmate be strip-searched when he or she is placed in either administrative segregation or a restrictive housing unit is reasonable and valid.") (citing State of Connecticut Administrative Directive 6.7 ("Searches Conducted in Correctional Facilities"), at § 5(A)).[3]

Because Plaintiff's Fourth Amendment claim regarding an intrusive strip search fails to state a plausible claim, it will be DISMISSED.

## 2. **Eighth Amendment**

Abrams' allegations regarding the strip search also do not state an Eighth Amendment claim. The Second Circuit has held that a prisoner's claim that he was subjected to an unreasonably intrusive strip or cavity search for purposes of the prison official's sexual gratification may constitute a cognizable § 1983 claim. *See Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) ("[A] search may not be undertaken maliciously or for the purposes of sexually abusing an inmate"). *See also*

---

[3] Pursuant to this provision, a strip-search of an inmate must be conducted "upon initial placement in a specialized housing unit, to include ... administrative segregation ... [and] restrictive housing." Admin. Directive 6.7(5)(A)(6)(a) and (h).

*Bell v. Wolfish*, 441 U.S. 520, 560 (1979) (body cavity searches of inmates must be reasonable in scope). Here, Abrams does not allege that the search was conducted for sexual gratification or some other harmful purpose. Therefore, his Eighth Amendment claim for an overly intrusive strip search will also be DISMISSED.

## G.     Due Process Claim

Abrams alleges that Investigator Kelly and Officer Waters failed to properly investigate and document the events of Brown's assault on Abrams on August 4, 2017. Doc. 1, ¶¶ 73-74. He alleges that such failure constituted a denial of due process under the Fifth Amendment because it resulted in his placement in segregation for twenty days. *Id.,* ¶¶ 69-79, 83-84, 101-02.

The Fifth Amendment applies to the federal government, but not to the states. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466 (S.D.N.Y. 2009)(("[I]it is clear that Plaintiff fails to state any claim under the Fifth Amendment;" and accordingly, "any due process claim he has against the City is properly brought under the Due Process Clause of the Fourteenth Amendment, not under that of the Fifth Amendment."). Because Plaintiff's lawsuit does not allege any deprivation of his rights by the federal government, Abrams has failed to state a claim under the Fifth Amendment. Thus, his Fifth Amendment claims must be DISMISSED.

To the extent Abrams is attempting to allege a due process claim under the Fourteenth Amendment against Kelly and Waters, he must show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515

U.S. 472, 484 (1995). In *Sandin v. Conner*, the Supreme Court expressly held that a state prisoner who is subjected to disciplinary punishment that is within the prisoner's expected condition of confinement cannot establish deprivation of a protected liberty interest. Only disciplinary actions which impose an "atypical and significant hardship in relation to the ordinary incidents of prison life" may constitute a constitutional deprivation. *Id.* at 484.

In *Sandin*, the prisoner brought a § 1983 action against several prison officials alleging that they had violated his constitutional right to procedural due process by sentencing him to disciplinary segregation without permitting him to call certain witnesses. *Id.* at 476. The Supreme Court rejected the contention that any action taken by correctional officials as a punitive measure necessarily encroaches upon a liberty interest protected under the Due Process Clause. *Id.* at 484. Moreover, as to time limits for disciplinary confinement, the Supreme Court held that a prisoner who was subjected to a disciplinary term of thirty days of confinement in restrictive housing did not sustain a deprivation of a liberty interest in violation of the Fourteenth Amendment's Due Process Clause. *Id.* Given the prisoner's indeterminate sentence of 30 years to life, his confinement in disciplinary segregation for 30 days "did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." *Id.* at 486. The Supreme Court concluded that such confinement did not constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" inasmuch as "[t]he regime to which [the prisoner] was subjected . . . was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 484, 486-87.

In the case at bar, Abrams's twenty-day confinement in segregation, falling well short of thirty days, does not, in and of itself, constitute a sufficient deprivation of liberty subject to due process

protection. This twenty-day restriction imposes no "atypical and significant hardship" in relation to the fifty-one (51) year term of imprisonment to which Abrams was sentenced for attempted murder, assault, and criminal possession of a firearm under Conn. Gen. Stat. §§ 53a-49, 53a-54a(a), 53a-59(a)(1), 53a-217. *See State v. Abrams*, No. DBDCR00110691, 2013 WL 6038339, at *1 (Conn. Super. Ct. Oct. 24, 2013) (discussing conviction at docket no. CR00–110691).

Moreover, Plaintiff admits in his complaint that the disciplinary ticket against him was ultimately dismissed. With respect to an inmate being charged with an offense that would deprive him of good-time credit, it is well settled that the inmate is entitled only to the minimum procedures appropriate to insure that his due process rights are not arbitrarily abrogated. *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). In general, in this context, "some kind of hearing is required." *Id.* at 557.

In the case at bar, Plaintiff received a disciplinary hearing; and on August 22, 2017, Hearing Officer King decided to dismiss the charge against Abrams based on the evidence. King "ruled that due to the manner [in which] the [disciplinary] ticket was written, . . . inmate Brown pleading guilty to the assault ticket and having no injuries, . . . the injuries Plaintiff sustained, . . . the incident occurring in the cell without any video footage, and . . . no one refuting the Plaintiff's explanation that he did not fight back, she decided to dismiss the Plaintiff's ticket for fighting." Doc. 1, ¶ 47. On the facts pled, Abrams received the minimum procedures appropriate to insure that his due process rights were not violated. At the conclusion of an evidentiary hearing, his ticket was dismissed.

Absent facts to support an alleged deprivation of due process, Abrams has failed to state

plausible due process claim against Kelly or Waters.  If construed as claims arising under the Fourteenth Amendment, his due process claims must be DISMISSED.[4]

## H.   State Law Claims

In addition to his federal claims, Abrams has raised the following state law claims against the defendants remaining in the action:

- assault, battery, negligence, and intentional infliction of emotional distress against Phillips for using excessive force against Plaintiff during the incident with Brown on August 4, 2017;

- negligence against Waters for failure to adequately document and report the events of Brown's assault on Plaintiff on August 4, 2017;

- negligence against Nunez for failure to prevent Brown's assault on Plaintiff (*i.e.*, for pairing Plaintiff with this "high security risk" prisoner);

- negligence and intentional infliction of emotional distress against Watson for failure to address and abate the mold in Abrams's cell vent in segregation; and negligence against Watson for failure "to correct an unconstitutional policy" of intrusive strip search; and

- and negligence against Kelly for failure to properly investigate the assault by Brown on Plaintiff on August 4, 2017.

Doc. 1, ¶¶ 95-109.

_____

[4] To the extent that Plaintiff suggests he was mistreated because he is black, his conclusory allegations fail to state a claim.  For example, Plaintiff states that "Kelly is white" and Phillips is "a white officer."  Doc. 1, ¶ 76.  Abrams alleges no facts to establish that any defendant was racially motivated to harm him.  He simply says that "two Hispanic inmates were released from segregation after only 4 days" after they were involved in attacking "a black inmate who managed to get the best of them."  Such allegations are insufficient to establish a racial motive for any action taken by defendants toward him.

The Court may exercise supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a), which provides in pertinent:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

"The concept of supplemental jurisdiction, first codified in 28 U.S.C. § 1367 in 1990, has its origins in the judicial doctrine of pendent jurisdiction, discussed by the United States Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–29 (1966)." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (lateral citations omitted). Under *Gibbs*, "a federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" 316 F.3d at 305 (citing and quoting *Gibbs*, 383 U.S. at 725). District courts apply the "common nucleus of operative fact" test to determine whether supplemental jurisdiction exists in a given case. *See, e.g., Morris v. Yale Univ. Sch. of Med.*, No. 05CV848 (JBA), 2006 WL 908155. at *3 (D.Conn. April 4, 2006).

Moreover, the Second Circuit stated of the Article III constitutional concept: "A state law claim forms part of the same controversy if it and the federal claim derive from a common nucleus of operative fact. This is so even if the state law claim is asserted against a party different from the one named in the federal claim." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (citations and internal quotation marks omitted).

As discussed *supra*, the only plausible constitutional claims set forth in Plaintiff's Complaint include: Plaintiff's Eighth Amendment "excessive force" claim against Phillips; Plaintiff's Eighth

27

Amendment "failure to protect claim" against defendant Nunez; and Plaintiff's Eighth Amendment "hazardous conditions of confinement" claim against Watson for deliberate indifference to black mold on the vent in his segregation cell.

In the case at bar, all of the state law negligence claims against the defendants are barred by Conn. Gen. Stat. § 4-165. These claims are brought against state prison officials for their allegedly negligent actions and/or inactions taken within the scope of their employment. Under Connecticut law, "state employees may not be held personally liable for their negligent actions performed within the scope of their employment." *Miller v. Egan*, 265 Conn. 301, 319 (2003) (citing Conn. Gen. Stat. §4-165). Therefore, if a corrections officer or prison official acts negligently, as opposed to wantonly or recklessly, in the scope of his employment, Conn. Gen. Stat. § 4-165(a) bars recovery on a negligence claim.

Under Conn. Gen. Stat. § 4-165(a), "No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment." *See, e.g.*, *Hamilton v. Lajoie*, 660 F. Supp. 2d 261, 266 (D. Conn. 2009) (in action where correctional officers engaged in altercation with inmate, resulting in inmate's head trauma, abrasions to ear and shoulder, and post-traumatic stress, court held that if defendant correction officers "acted wantonly, that will support [plaintiff's] claim . . . that they violated his constitutional rights;" but if they "acted negligently, . . . § 4-165(a) bars recovery"); *Schofield v. Magrey*, No. 3:12CV544 JBA, 2015 WL 521418, at *13 (D. Conn. Feb. 9, 2015) ("To the extent that Plaintiff asserts claims against the individual [police officer] defendants in their personal capacities, rather than the Towns, Conn. Gen.Stat. § 4-165 applies" so "Plaintiff's negligence-based claims against Defendants . . . must be dismissed."); *Ziemba v. Lajoie*, No.

3:11CV845 (SRU), 2012 WL 4372245, at *5 (D. Conn. Sept. 24, 2012)(dismissing negligence claims against correctional officers under Conn. Gen.Stat. § 4–165 because 'state employees may not be held personally liable for their negligent actions performed within the scope of their employment'") (quoting *Hamilton*, 660 F.Supp. at 265).

Accordingly, pursuant to Conn. Gen. Stat. § 4-165(a), Plaintiff's negligence claims against Phillips (for use of excessive force), Waters (for failure to adequately report Brown's assault on Plaintiff), Nunez (for failure to protect Plaintiff from a "high security risk" cellmate); Watson (for failure to abate the black mold in Plaintiff's segregation cell and or failure to correct the "unconstitutional policy" of strip search), and Kelly (for failure to properly investigate Brown's assault on Plaintiff on August 4, 2017) are all DISMISSED.

In contrast, "[s]tate employees do not . . . have statutory immunity for wanton, reckless or malicious actions, or for actions not performed within the scope of their employment." *Miller,* 265 Conn. at 319. "For those actions, they may be held personally liable, and a plaintiff who has been injured by such actions is free to bring an action against the individual employee." *Id.*

The Court thus turns to examine Plaintiff's state law claims for the intentional torts of assault, battery, and intentional infliction of emotional distress. With respect to these tort actions against Phillips for excessive use of force, such claims arise under the same set of facts as those which give rise to Plaintiff's Eighth Amendment "excessive force" claim. The Court thus has supplemental jurisdiction over this claim, which derives from a common nucleus of operative fact with a federal claim.

The Court examines the prima facie elements of assault, battery, and intentional infliction of emotional distress to determine whether Plaintiff has stated any plausible tort claim against

Phillips. Under Connecticut law, "[a] civil assault is defined as 'the intentional causing of imminent apprehension of harmful or offensive contact with another.'" *Germano v. Dzurenda*, 09 Civ. 1316 (SRU), 2011 WL 1214435, at *22 (D. Conn. Mar. 28, 2011) (quoting *Dewitt v. John Hancock Mutual Life Ins. Co.*, 5 Conn. App. 590, 594 (1985)). Plaintiff has alleged that Phillips entered Abrams's cell and sprayed him with mace. Doc. 1, ¶ 50. Then, while Abrams "was bent over to cover his eyes while gasping for air," Phillips picked Abrams up and slammed him face-first to the floor. *Id.*, ¶ 51. As a result of being thrown, Plaintiff received a "hairline fracture to his nose." *Id.*, ¶¶ 37, 55-56. Under these circumstances, Plaintiff has stated a claim for assault by alleging that Phillips intentionally caused imminent apprehension of harmful or offensive contact with him. During the spraying of mace and while being slammed face-first to the ground, Plaintiff plausibly experienced apprehension of harmful or offensive contact with Phillips.

With respect to battery, the Connecticut Supreme Court has held that "an actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Germano*, 2011 WL 1214435, at *22 (quoting *Alteiri v. Colasso*, 168 Conn. 329, 334 n.3 (1975)). Plaintiff has alleged the elements of a battery claim in that, in addition to the elements for assault, Plaintiff has alleged actual harmful contact with Phillips when Phillips sprayed mace in Plaintiff's eyes and physically lifted and slammed him to the floor.

In order to assert a claim for intentional infliction of emotional distress, a plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct

was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000) (quoting *Petyan v. Ellis*, 200 Conn. 243, 253 (1986); *see also Cavuoto v. Oxford Health Plans, Inc.*, No. 3:99-CV-00446 (EBB), 2000 WL 888263 at *8 (D.Conn. June 22, 2000); *DeLaurentis v. New Haven*, 220 Conn. 225, 266-67 (1991). To be held liable for intentional infliction of emotional distress, one's conduct must be "so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind." *Miller*, 126 F. Supp. 2d at 194.

Given the inherently stressful nature of being maced and then slammed to the floor face first, the Court construes the facts liberally to find that Plaintiff has stated a plausible claim for intentional infliction of emotional distress against Phillips for his violent conduct on August 4, 2017. Absent an ongoing violent interchange between prisoners, it is "extreme and outrageous" to willfully body-slam an inmate face-first to the floor, exerting enough force to fracture his nose. Such action goes beyond the bounds of decency and civilized behavior.[5] At the screening stage, the Court interprets the facts to state the strongest argument that they suggest. Accordingly, the case may proceed as to Plaintiff's intentional infliction of emotional distress claim against Phillips.

The Court next assesses Plaintiff's intentional infliction of emotional distress claim against Watson with respect to the allegedly hazardous condition of black mold on the vent in his segregation cell. This claim arises under the same case and controversy as the Eighth Amendment

---

[5] "Whether conduct may be 'reasonably regarded' as extreme and outrageous is a question, in the first instance, for the court." *Huff v. W. Haven Bd. of Educ.*, 10 F. Supp. 2d 117, 122–23 (D. Conn. 1998) (citing *Kintner v. Nidec–Torin Corp.*, 662 F.Supp. 112, 114 (D.Conn.1987)).

hazardous "conditions of confinement" claim against Watson, affording the Court supplemental jurisdiction over it. However, this state tort claim fails to state a plausible claim.

Even if the Court were to liberally construe Plaintiff's allegations to find that Watson intended to inflict emotional distress upon him (by ignoring the black mold) and that Plaintiff was consequently severely stressed, the Court does not find that Watson's actions were "extreme and outrageous," as those terms are interpreted at common law. The standard in Connecticut to demonstrate extreme and outrageous conduct is "stringent." *Huff v. W. Haven Bd. of Educ.*, 10 F. Supp. 2d 117, 122 (D. Conn. 1998). "[E]xtreme and outrageous" conduct is defined as that which "exceed[s] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *DeLaurentis v. New Haven*, 220 Conn. 225, 267 (1991).

Whether conduct may be "reasonably regarded" as extreme and outrageous is a determination for the court. *Kintner v. Nidec–Torin Corp.*, 662 F.Supp. 112, 114 (D.Conn.1987). Moreover, "[m]ere conclusory allegations are insufficient as a matter of law to support a cause of action for intentional infliction of emotional distress." *Huff*, 10 F. Supp. 2d at 122 (citing *Ruffolo v. Oppenheimer & Company, Inc.*, No. 90 Civ. 4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991), *aff'd*, 949 F.2d 33 (2d Cir.1991)).

Here, Plaintiff merely alleges that "Watson didn't take the Plaintiff's claims [about the mold] seriously" and told him to "stay out of seg[regation]" to avoid the mold. Doc. 1, ¶ 68. Granted, Watson's ignoring or refusing to abate an alleged unhealthy condition like mold may stem from callousness, or even ignorance of the severity of the problem, but it does not seem "especially calculated to cause . . . [serious] mental distress;" nor does it rise to the level of "extreme and

outrageous" behavior, exceeding "all bounds usually tolerated by decent society." *DeLaurentis*, 220 Conn. at 267.

Failure to act is not *affirmative* misconduct. Connecticut courts have held that a failure to act does not rise to the level of "extreme and outrageous behavior." *See, e.g., Germano v. Dzurenda*, No. 3:09CV1316 SRU, 2011 WL 1214435, at *21 (D. Conn. Mar. 28, 2011) (dismissing prisoner's claim for intentional infliction of emotional distress for failure to state a claim where "there has been no allegation of affirmative misbehavior" by his defendant psychiatrists, only allegations that they "failed to take seriously [plaintiff prisoner's] threats of suicide"); *Giard v. Town of Putnam*, No. CV085002754S, 2008 WL 5481273, at *11 (Conn. Super. Ct. Dec. 3, 2008) (holding defendant school guidance counselor's conduct "could not, as a matter of law, be extreme and outrageous" because "[t]he alleged misconduct is the mere failure to act on unspecified information that the decedent was suicidal"). Accordingly, absent allegations of affirmative misconduct which is "extreme and outrageous," Plaintiff has failed to state a claim for intentional infliction of emotional distress against Watson. That claim must be DISMISSED.[6]

In sum, the Court will only permit the following state law claims to proceed: assault, battery, and intentional infliction of emotional distress against Phillips, which are factually related to Plaintiff's Eighth Amendment excessive force claim. All other state law claims are DISMISSED.

---

[6] The Court also notes that Plaintiff failed to allege severe emotional distress, which has been held to be a basis for dismissal of a claim for intentional infliction of emotional distress. *See, e.g.*, *Germano v. Dzurenda*, No. 3:09CV1316 SRU, 2011 WL 1214435, at *20 (D. Conn. Mar. 28, 2011) (dismissing claims for intentional infliction of emotional distress against prison doctor where "[t]he plaintiff [inmate] also has failed sufficiently to allege that the emotional distress the lack of a medical mattress caused him was severe").

## I.    Request for Declaratory Relief

In addition to damages, Abrams seeks declaratory judgments against all defendants for their alleged constitutional violations.  Doc. 1, ¶¶ 24-26.  Declaratory relief operates prospectively "to enable parties to adjudicate disputes before either side suffers great damage." *In re Combustion Equip. Assocs., Inc.*, 838 F.2d 35, 37 (2d Cir. 1988).  In particular, "[t]o obtain prospective relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia*, "a sufficient likelihood that he [or she] will again be wronged in a similar way." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)), *cert. denied*, 568 U.S. 1212 (2013).  "That is, a plaintiff must demonstrate a "certainly impending" future injury." *Marcavage*, 689 F.3d at 103 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

In this action, the claims that this Court has deemed plausible and will allow to proceed concern *past* problems during incarceration at Cheshire C.I., a facility where Plaintiff was previously housed.  These claims include no alleged ongoing or future suffering at Corrigan.  In sum, Abrams has not identified any prospective legal relationships or issues that require resolution via declaratory relief.  All claims for declaratory relief must be DISMISSED.

## IV.  CONCLUSION AND ORDERS

(1)   All claims against defendants Erfe, Doe, Ramirez, Waters, and Kelly are hereby DISMISSED.

(2)   Plaintiff may proceed with the following federal claims in this action: Eighth Amendment claim for "excessive force" against Phillips,  Eighth Amendment claim for "failure to protect" from harm against Nunez, and Eighth Amendment hazardous "conditions of confinement"

claim against Watson.  Each federal claim is permitted against the defendant solely in his individual capacity for money damages.

(4)   Abrams's state law claims of assault, battery, and intentional infliction of emotional distress may proceed against Phillips in his individual capacity for damages.  All other state law claims are DISMISSED.

(5)   Abrams's requests for declaratory relief are DISMISSED.

(6)   The Clerk shall verify the current work addresses for defendants Phillips, Nunez, and Watson with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint to each defendant at the confirmed address within **twenty-one (21)** days of this Order, and report to the Court on the status of the waiver request on the **thirty-fifth (35) day** after mailing.  If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on him, and the defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(7)   Phillips, Nunez, and Watson shall file their response to the Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include any and all additional defenses permitted by the Federal Rules.

(8)   Discovery, pursuant to Federal Rules of Civil Procedure 26 to 37, shall be completed within **six months (180 days)** from the date of this Order.  Discovery requests need not be filed with the court.

(9)  All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this order.

The foregoing is SO ORDERED.

Signed: New Haven,  Connecticut
           February 2, 2018

                                                    */s/Charles S. Haight, Jr.*
                                                    CHARLES S. HAIGHT, JR.
                                                    Senior United States District Judge